# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-1622

———————

| | | |
|---|---|---|
| John Munson Morris; Margaret Morris, | * | |
| | * | |
| Appellees, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Arkansas. |
| Union Pacific Railroad, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: January 15, 2004
Filed: June 28, 2004

———————

Before WOLLMAN, MORRIS SHEPPARD ARNOLD, and COLLOTON, Circuit
Judges.

———————

COLLOTON, Circuit Judge.

In this diversity action against Union Pacific Railroad for personal injuries, a jury returned a verdict for the plaintiff, John Morris. Union Pacific appeals. We reverse and remand for a new trial.

I.

John Morris owned and operated a wrecking company in Waldo, Arkansas. On November 8, 1999, a west-bound Union Pacific train collided with a tractor-trailer truck at the Olive Street railroad crossing in Waldo. The impact separated the truck's two trailers, leaving the front trailer on the north side of the track, and the rear trailer on the south side. No one was hurt in the collision. The train eventually came to a stop, but when it did, it blocked Olive Street and two other crossings, thereby impeding both train and auto traffic in the area.

Morris was contacted by a local sheriff's dispatcher to remove the damaged trailers from the crossing. He arrived at the south side of the Olive Street crossing, and began to survey the wreckage for removal. The damaged rear trailer was close to the train. It was separated from the train by only a few inches at one corner, while another corner was several feet from train. Morris moved into the resulting triangular space between the trailer and the train to see whether the wreckage was entangled with the train. While making his inspection, the train moved forward. There is evidence in the record that the train moved without warning, and that a protrusion pulled and pinched Morris through the narrow opening between the westernmost edge of the trailer and the train. Morris suffered severe facial trauma, brain injury, and psychological harm.

Morris and his wife filed this action alleging that Union Pacific was at fault for Morris's injuries. After a trial, a jury found in favor of Morris, and awarded him $8 million in compensatory damages, but no punitive damages.

Union Pacific advances four contentions on appeal. First, Union Pacific claims that it was entitled to judgment as a matter of law on Morris's negligence claim. Second, Union Pacific claims that the district court erred by giving an adverse inference instruction as a sanction for Union Pacific's routine destruction of an

audiotape containing communications between the train's crew and the dispatcher. Third, Union Pacific argues the district court's instruction to the jury on premises liability was misleading and prejudicial. Last, Union Pacific argues that it was error to submit the issue of punitive damages, and evidence of Union Pacific's net worth, to the jury, and that the district court should have granted the railroad's motion for judgment as a matter of law on the punitive damages claim.

## II.

Union Pacific claims that under Arkansas law, which governs this diversity case, Morris's contributory negligence entitles the railroad to judgment as matter of law. We disagree.

Union Pacific argues that Morris himself was negligent to a greater degree than the railroad because he "suddenly and without warning plac[ed] himself in a position of extreme danger, which UP could not anticipate or prevent." The railroad cites several crossing injury cases, from the early 20th century, holding that a railroad was not liable because a injured party's negligence exceeded that of the railroad, or the railroad could not have prevented the injury. *See Thrower v. Henwood*, 173 S.W.2d 861, 867-68 (Mo. 1943) (Arkansas law) (lookout could not have avoided the accident where claimant had attempted to climb between cars at crossing); *St. Louis-San Francisco Ry. Co. v. Sheppard*, 109 S.W.2d 109, 110-11 (Ark. 1937) (no evidence that lookout could have seen trespasser who crawled under car); *Cato v. St. Louis-Southwestern Ry. Co.*, 79 S.W.2d 62, 62-63 (Ark. 1935) (contributory negligence of victim who attempted to pass under or between the cars); *St. Louis-San Francisco Ry. Co. v. McClinton*, 9 S.W.2d. 1060, 1062 (Ark. 1928) (victim "must necessarily have known there was peril in climbing between cars which might be moved"); *Kelly v. De Queen & E. R.R. Co.,* 298 S.W. 347, 349 (Ark. 1927) ("whether the injury to deceased could have been avoided, if an efficient lookout had been kept, is entirely conjectural"); *Curtis v. St. Louis&San Francisco R.R. Co.*, 131 S.W. 947, 948-49

(Ark. 1910) (injured party grossly negligent in attempting to cross between cars when train was ready to move).

Union Pacific characterizes Morris's movements as a "sudden impulse," and claims that Morris was to blame for the accident because he placed his head in a position of extreme peril between or around the corner of the trailer and the train. There is evidence in the record, however, to support the conclusion that Morris did not suddenly place his head in a position of extreme danger, that a lookout or sounding of a whistle could have prevented the injury, that Morris was hurt when a protrusion on the side of the train caught him and forced him through the narrow gap between the trailer and the train, or that other negligence by Union Pacific caused the accident. This evidence distinguishes Morris's situation from those found in the authorities cited by Union Pacific. On the record before us, it was within the province of the jury, which was instructed to rule in favor of Union Pacific if Morris's negligence was "equal or greater" than that of the railroad, to resolve the issue of Morris's alleged contributory negligence. *See St. Louis-San Francisco Ry. Co. v. Horn*, 269 S.W. 576, 578 (Ark. 1925) (contributory negligence in crossing accident not equal in degree to railroad's as a matter of law: "it was a question to be left to the jury.").

III.

Union Pacific next argues that the district court erred in giving an adverse inference instruction regarding the destruction of an audiotape recorded by the railroad on the date of the accident. Union Pacific routinely tapes communications between its train crews and the railroad's dispatcher, and then recycles the tapes after 90 days. At the time Morris filed suit, the recording -- which would have contained communications between the train crew and the railroad dispatcher before and after Morris's injury -- had long since been destroyed. Before trial, Morris filed a motion

for sanctions on the ground that Union Pacific should not have destroyed the recording.

The district court granted Morris's motion and concluded that an adverse inference instruction was proper. In so ruling, the district court found that the document retention policy was reasonable on its face, and that Union Pacific "did not intentionally destroy the tape." Nevertheless, relying on *dicta* from this court's decision in *Lewy v. Remington Arms Co*, 836 F.2d 1104, 1112 (8th Cir. 1988), the district court concluded that where evidence is destroyed pursuant to a valid document retention policy, "a finding of no intent is no longer dispositive of the issue." The court then concluded that destruction of the audiotape constituted "bad faith" because Union Pacific was "on notice" that litigation was likely to ensue after the Morris accident. In finding bad faith, the district court relied on "the frequency of accidents that result in litigation," the "magnitude of injuries that can occur" from railroad accidents, and "the quality of the evidence that is [ ] preserved in an audio tape of the actual communications of railroad employees in the midst of an accident."

In accord with its pretrial ruling, the district court gave the following instruction to the jury during the course of the trial:

> [Y]ou've heard evidence that there was an audio tape recording of communications made by railroad employees over their radios, including the communications between the railroad dispatcher and the employees on the train in Waldo. The tape was erased about 90 days after the accident because Union Pacific has a policy to reuse it's [sic] audio voice tapes and it is usual procedure to record over the tapes after 90 days. However, this court found in another hearing or a previous hearing that Union Pacific should not have re-recorded this tape pursuant to its policy but should have saved the tape because it was on notice that a serious injury had occurred and it knew there was a possibility that a lawsuit would follow the injury. Because Union Pacific destroyed the information on the tape when it should have kept

-5-

the information, you may, you may, infer that there was information in the recorded communications that would have proved damaging to Union Pacific or helpful to John Morris.

Relying on this adverse inference instruction, counsel for Morris argued extensively to the jury that it should infer evidence damaging to Union Pacific from the missing audiotape. Among the inferences suggested were that dispatchers at Union Pacific headquarters in Omaha directed the crew to move the train notwithstanding the crew's protest that it could not be done safely, that train movement was rushed because dispatchers were concerned about train traffic, and that the train crew made admissions during spontaneous chatter between the crew and dispatchers following the accident. There was no direct evidence of these facts introduced at trial, and members of the train crew disputed them. Counsel also emphasized to the jury that Union Pacific was "destroying evidence," which it was "not supposed to do."

An adverse inference instruction is a powerful tool in a jury trial. When giving such an instruction, a federal judge brands one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury. It necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of an erased audiotape. As the district court in this case put it colloquially, "it's like cow crap; the more you step in it, the more it stinks." One distinguished court years ago cautioned against use of an adverse inference instruction like the one given in this case (there, involving an absent witness rather than missing evidence), because "[t]he jury should not be encouraged to base its verdict on what it speculates the absent witness would have testified to, in the absence of some direct evidence." *Felice v. Long Island R.R. Co.*, 426 F.2d 192, 195 n.2 (2nd Cir. 1970) (Friendly, J.).

Presumably cognizant of these factors, our court in *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739 (8th Cir. 2004), recently clarified what circumstances justify

-6-

the sanction of an adverse inference instruction. *Stevenson* specifically addressed the pre-litigation destruction of documents pursuant to Union Pacific's document retention policy. While acknowledging that *dicta* in *Lewy* had articulated a "knew or should have known" negligence standard for imposition of the sanction, we ultimately rejected that approach, and held that "there must be a finding of intentional destruction indicating a desire to suppress the truth" before an adverse inference instruction is justified. *Id.* at 746. Though observing that the case before it "test[ed] the limits of what we are able to uphold as a bad faith determination," the *Stevenson* court held that the district court did not abuse its discretion in finding that Union Pacific acted with the requisite intent to destroy evidence for the purpose of suppressing evidence. *Id.* at 747-48.

The district court in this case did not have the benefit of the clarification in *Stevenson* that a finding of intent is required to impose the sanction of an adverse inference instruction. In light of *Stevenson*, we conclude that the adverse instruction was not proper in this case.

The most important consideration in our analysis is the district court's own finding regarding Union Pacific's intent. The district court specifically concluded that Union Pacific "did not intentionally destroy the tape." (Addendum at 12). This does not strike us as a casual or off-handed finding. The district court acknowledged that "[h]istorically, spoliation only arose from the intentional destruction of evidence, and therefore a finding that the spoliator *intentionally* destroyed the evidence was a prerequisite to prevail in a motion for sanctions for spoliation." (emphasis in original). Only after reaching the understandable conclusion, based on our court's opinion in *Lewy*, that "a finding of no intent is no longer dispositive of the issue" did the district court rule that Union Pacific should be sanctioned for destroying the audiotape.

Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors. The district court conducted four days of evidentiary hearings concerning the destruction of audiotapes, and developed a substantial record from which to make a judgment about Union Pacific's intent. We accept at face value the district court's finding that Union Pacific did not intentionally destroy the audiotape, and we conclude that it is not clearly erroneous.

We recognize that the district court did find that Union Pacific's destruction of the audiotape at issue in this case constituted "bad faith" on the part of the railroad. That ruling, however, must be viewed in the context of our court's decision in *Lewy*, which stated in *dicta* that a finding of "bad faith" was warranted where a corporation "knew or should have known" that evidence would become material at some point in the future. 836 F.2d at 1112. The district court's heavy reliance on *Lewy*, and its specific conclusion that Union Pacific did not intentionally destroy the tape, lead us to conclude that the court's finding of "bad faith" was premised on the "knew or should have known" standard suggested by *Lewy*, but rejected by *Stevenson*.

Despite the district court's finding, Morris points to the facts deemed sufficient in *Stevenson* to sustain a finding of intent to destroy evidence, and argues that the record in this case is similar enough to require the same conclusion regarding the railroad's intent. It is true that *Stevenson*, like the district court in this case, cited Union Pacific's "general knowledge that such tapes would be important to any litigation over an accident that resulted in serious injury or death, and its knowledge that litigation is frequent when there has been an accident involving death or serious injury." *Stevenson*, 354 F.3d at 748. *Stevenson* also cited evidence that "Union Pacific was careful to preserve a voice tape in other cases where the tape proved to be beneficial to Union Pacific," *id.*, and the district court in this case noted that Union

Pacific had requested voice tapes when they believed the information was needed in a particular case.

*Stevenson* also relied, however, on events specific to the accident investigation in that case. The court observed that "Union Pacific made an immediate effort to preserve other types of evidence but not the voice tape." *Id*. at 748. Specifically, in *Stevenson*, Union Pacific's claims representative contacted the railroad's dispatching center in Omaha "to request copies of the train orders and warrants, the train consist, and a dispatcher's record of the train's movement," but did not request a copy of the voice tape that was stored in the same dispatch center. *Id*. at 747. This fact, in combination with the other considerations previously mentioned, created a "sufficiently strong inference of an intent to destroy [the tape] for the purpose of suppressing evidence of the facts surrounding the operation of the train at the time of the accident." *Id*. at 748.

In this case, unlike *Stevenson*, the district court did not find that the Union Pacific claims representative went about selecting and preserving documentary evidence relating to Morris's accident from the dispatch center while declining to preserve the audiotape. The claims representative assigned to the Morris accident stated that after visiting the scene, he was unaware of the extent of Morris's injuries, and he concluded that the railroad had no liability. The director of dispatching for Union Pacific testified at the sanctions hearing that there was no reason not to follow the standard 90-day retention policy in this case. The distinction between the cases may be modest, but *Stevenson* "test[ed] the limits" of what evidence will justify an adverse inference instruction. *Id.* at 747. The absence of particularized information to support an inference that Union Pacific personnel consciously permitted the destruction of a relevant audiotape is a reasonable basis for differing conclusions about the railroad's intent.

More generally, we reiterate that a finding of intent is a highly contextual exercise. As juries are often instructed, "[i]ntent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind." *First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*, 2 F.3d 801, 813 (8th Cir. 1993). When a corporation is involved, the inquiry depends in part on corporate policies, but also to some extent on the intent of corporate employees, not all of whom will play the same role in every case. This case and *Stevenson*, for example, involved different claims representatives, who proceeded differently with their investigations, and may well have been guided by different mental states. Variances in key personnel, nuances in fact situations, or even different credibility assessments of identical evidence can lead to varying conclusions about the formation of a corporate intent. After reviewing the district court's orders and the transcripts of the lengthy sanctions hearings, we are not left with a definite and firm conviction that the district court committed a mistake in finding that Union Pacific did not intentionally destroy the tape, or that the evidence compels a contrary conclusion.

The adverse inference instruction, when not warranted, creates a substantial danger of unfair prejudice. As recounted above, counsel for Morris made extensive use of the instruction, and encouraged the jury to speculate that the missing audiotape contained admissions and other information damaging to Union Pacific. Thus, having concluded that the instruction should not have been given on this record, we hold that Union Pacific was prejudiced, and that a new trial is required.

IV.

Union Pacific also argues that the district court should have granted judgment as a matter of law in favor of Union Pacific on the plaintiff's claim for punitive damages. Particularly in view of our conclusion concerning the adverse inference instruction, we conclude that there was not a submissible case for punitive damages, and the claim should be dismissed.

-10-

Punitive damages are "not a favorite of the law" in Arkansas. *In re Aircraft Accident at Little Rock*, 351 F.3d 874, 876 (8th Cir. 2003) (quoting *Diamond Shamrock Corp. v. Phillips*, 511 S.W.2d 160, 164 (Ark. 1974)). An award of punitive damages is justified "only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred." *D'Arbonne Constr. Co. v. Foster*, 123 S.W.3d 894, 898 (Ark. 2003). Gross negligence is not sufficient. *In re Aircraft Accident*, 351 F.3d at 877. Rather, "it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred." *D'Arbonne*, 123 S.W.3d at 898. A claim for punitive damages is properly submitted to the jury under Arkansas law where the claim is supported by "substantial evidence." *Id.* at 897-98; *Stein v. Lukas*, 823 S.W.2d 832, 835 (Ark. 1992).

In this action, the district court instructed the jury in accordance with the Arkansas Model Jury Instructions as follows:

> In order to recover punitive damages from Union Pacific Railroad Company, John and Margaret Morris have the burden of proving:
>
> The Union Pacific Railroad Company knew or ought to have known, in the light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage and they continued such conduct in a reckless disregard of the consequences from which malice may be inferred.

In support of this instruction, Morris relies in part on what he calls "inferential evidence," by which he means "adverse inferences" that the jury was permitted to draw based on the spoliation instruction. Morris argues that inferences arising from the spoliation, combined with other evidence, provided sufficient foundation to submit the issue of punitive damages to the jury. *See Union Pac. R.R. Co. v. Barber*,

-11-

No. 03-57, 2004 WL 352525 (Ark. Feb. 26, 2004). In light of our holding that the adverse inference instruction was not appropriate, speculation regarding the content of the destroyed audiotape cannot provide the basis for the submission of punitive damages to the jury.

Morris also points to three other categories of evidence to justify the punitive damages instruction. First, Morris asserts that Union Pacific knew that wreckage and bystanders were in the "red zone" immediately next to the train when Morris was injured. Second, Morris argues that Union Pacific moved the train without an adequate lookout or warning, and that it may be inferred that the lack of such precautions was Union Pacific policy regarding train movement after an accident. Third, Morris contends that Union Pacific rushed train movement while Morris was in a precarious position. Morris argues that trains were waiting to get through, the train was moved without a proper job briefing and before the scene was released by local law enforcement, and the train was moved a second time (without causing injury) while people were trying to assist Morris. Morris also argues that because the train crew was not disciplined for negligence or carelessness, a jury could infer that Union Pacific's dispatcher ordered them to rush train movement.

In view of the strict Arkansas standards, we conclude that there is not substantial evidence from which a reasonable jury could find that Union Pacific acted wantonly in causing Morris's injury or with such a conscious indifference to the consequences that malice may be inferred. Absent speculation based on the adverse inference instruction, there is no evidence that the train crew was ordered to rush train movement with reckless disregard for the risk of serious injury. Although the train crew knew that the damaged trailer was near the train and that people had gathered in the area of the accident, there was not substantial evidence that the train crew was consciously indifferent to whether or not someone might be hit. The evidence showed that the crew did make some purposeful efforts to protect persons in the area of the train: the conductor kept a lookout on the north side of the train (but not on the

-12-

south side); the conductor solicited assistance from the local police chief, who did shout a warning to persons on the south side of the train; and the engineer surveyed the landscape, albeit incompletely, before starting the train to ensure that no one in his field of vision was fouling the track. There was no evidence that the train crew was aware of the protrusion from the side of the train that one eyewitness stated was the cause of the injury, or that a specific party like Morris was in imminent danger.

While Union Pacific certainly is subject to the allegation that it acted negligently, we conclude that the evidence also shows that the train crew "was actively making choices, and exhibiting some level of care, with the apparent motivation of lessening risk and protecting the physical well-being" of persons in the vicinity of the train. *In re Aircraft Accident*, 351 F.3d at 881-82. Under these circumstances, we conclude that there is not substantial evidence that Union Pacific acted wantonly or with such conscious indifference that malice could reasonably be inferred. Accordingly, there was not a submissible case for punitive damages under Arkansas law, and we direct that the punitive damages claim be dismissed on remand. *See*, *e.g.*, *Burke v. Deere & Co.*, 6 F.3d 497, 513-14 (8th Cir. 1993).[1]

\* \* \*

---

[1]Union Pacific also claims that it was error for the district court to instruct the jury that "John Morris was an invitee on the premises of Union Pacific," and that "Union Pacific owed John Morris a duty to use ordinary care to maintain the premises in a reasonably safe condition." We need not determine whether this instruction, standing alone, constituted reversible error. We respectfully suggest, however, that the district court could clarify any such instruction in a new trial to ensure that the jury is not led to believe that Union Pacific could be liable because of its alleged negligence as a land owner, or because of its alleged fault in the collision between the train and the tractor-trailer, as opposed to Union Pacific's alleged negligence in its role as a train operator in the context of the premises that existed after the collision.

-13-

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for a new trial consistent with this opinion.

———————————————