# IN THE SUPREME COURT OF TEXAS

═════════════
No. 10-0846
═════════════

BROOKSHIRE BROTHERS, LTD., PETITIONER,

v.

JERRY ALDRIDGE, RESPONDENT

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════

JUSTICE GUZMAN, joined by JUSTICE DEVINE and JUSTICE BROWN, dissenting.

Courts exist as a mechanism for administering justice and arriving at truth. Spoliation, whether done negligently or intentionally, jeopardizes this essential function and cannot be condoned. Today, the Court articulates a spoliation framework that departs in significant ways from decades of spoliation jurisprudence as developed by our capable courts of appeals. In doing so, the Court places substantial limits on the trial court's discretion in crafting an appropriate remedy for acts of spoliation, and articulates a standard that, as applied by the Court, may permit the destruction of relevant evidence so long as it is—in name—done in accordance with a stated retention policy. Because I do not believe the Court's framework provides trial courts with the necessary discretion to appropriately remedy the wrongful destruction of evidence in an era where limited duration retention policies have become the norm, I respectfully dissent.

## I. Background

Jerry Aldridge slipped and fell while shopping at a Brookshire Brothers grocery store on September 2, 2004. Though initially unaware of the extent of his injury, Aldridge suffered a substantial spinal injury as a result of the fall. He sought medical attention later that day. On September 7, 2004, Aldridge returned to the store and reported his injuries to Jon Tyler, the store manager trainee on duty at the time. Tyler completed a customer incident report documenting Aldridge's fall.

Additionally, store surveillance cameras captured footage of the fall. After Aldridge reported the incident to Tyler, Robert Gilmer, the Vice President of Human Resources and Risk Management for Brookshire Brothers, instructed Tyler to view the surveillance video. Despite notice of the accident and the availability of footage covering the entire day of Aldridge's fall, Gilmer chose to copy and save only an eight-minute segment of footage, beginning just before Aldridge entered the store and concluding just after his fall.

Although Aldridge had yet to file a lawsuit, he requested a copy of the footage of his fall on September 13—less than one week after reporting his injuries. In a letter dated September 14, Gina Sorrell of Brookshire Brothers' claims department wrote to Aldridge and notified him that "[a]s a token . . . for being such a valuable customer," Brookshire Brothers agreed to pay for Aldridge's "first initial medical aid bill along with a follow-up visit and prescriptions for those visits." In a subsequent letter dated September 29, though Sorrell explained that Brookshire Brothers would additionally cover the costs of a visit with a neurosurgeon and "several weeks of physical therapy

2

along with the prescriptions,"[1] she indicated Brookshire Brothers would not comply with Aldridge's request for a copy of the footage of his fall because she "only ha[d] one copy at this time." Shortly thereafter, Brookshire Brothers allowed the tape containing the entire day's worth of footage, with the exception of the eight-minute segment showing Aldridge's fall, to automatically erase, rendering it unable to comply with Aldridge's request when he did file suit.[2]

Brookshire Brothers continued to cover Aldridge's medical expenses for nearly a year until June 2005, when Gilmer "re-reviewed the video recording" and determined that Brookshire Brothers would deny any responsibility with respect to Aldridge's claim. Aldridge retained an attorney, who requested a copy of the video referenced in Gilmer's June 2005 letter declining Aldridge coverage. Brookshire Brothers provided the eight minutes of footage covering the fall. But when Aldridge's attorney requested copies of additional surveillance footage beyond the preserved eight minutes (specifically, from 4:00pm until 6:30pm on the day of the incident), Brookshire Brothers declined to provide the footage. And, rather than explaining that the footage had been automatically recorded-over pursuant to a standard and routine practice, Gilmer stated:

> The video you have requested does not focus on the area where Mr. Aldrige "fell."
> Please understand that short of litigation, I have been reasonably generous in what

---

[1] Brookshire Brothers has a routine practice of covering the costs of an initial doctor's appointment and prescriptions. However, testimony at trial indicated that it was not routine practice for Brookshire Brothers to pay for the cost of a referral to a neurosurgeon and several weeks of physical therapy, as the September 29 letter indicated Brookshire Brothers would cover. Thus, on September 29, when the entirety of the September 2 footage was still available, Brookshire Brothers' claims department had agreed to cover the costs of more than the routine initial doctor's appointment.

[2] Gilmer testified that Brookshire Brothers' surveillance cameras are "on a clock," and the footage is recorded over every thirty-one days. Thus, the entirety of the September 2 video footage was presumably recorded over sometime in the beginning of October, roughly three weeks after Aldridge filed a customer incident report with Brookshire Brothers.

I have provided thus far. It is a "slip & fall" case. Seems we know how these ultimately resolve. If you decide to pursue a legal action on behalf of your client, you are well aware that we would be obligated to furnish certain information at that time. We are not going to assist you further in helping you build your case.

When asked at trial why Brookshire Brothers allowed the footage to be erased, Gilmer testified he saved the selected eight minutes of video simply to verify Aldridge had actually fallen and that he "didn't get what [he] got in anticipation of this trial" because "[i]t wasn't a lawsuit when it happened." But Gilmer also acknowledged his awareness of the fact that a key issue in slip-and-fall cases is whether a store employee knew or reasonably should have known that a substance was on the floor. In fact, at the time of trial, Gilmer testified that he had over four decades of experience working in the grocery store business, eighteen years of which he worked in the risk management department overseeing Brookshire Brothers' litigation. Despite Gilmer's knowledge and experience regarding slip-and-fall litigation, despite Aldridge's request for a copy of the footage of his fall less than two weeks after the fall occurred, and despite Brookshire Brothers' September 29 authorization of payment for Aldridge's medical expenses above and beyond the company's routine practice, the sole reason Gilmer provided for failing to preserve any more of the video was that he believed the rest of the footage "wasn't relevant" and that he "didn't know there was going to be a case" at the time the rest of the footage was automatically erased.[3]

---

[3] Of course, Brookshire Brothers' duty to preserve the footage is not limited to whether Gilmer *knew* "there was going to be a case;" rather, as we articulated in *Wal-Mart Stores, Inc. v. Johnson*, the relevant inquiry in determining whether there was in fact a duty to preserve evidence is whether Gilmer "[knew] *or reasonably should [have known]* that there [was] a *substantial chance* that a claim will be filed and that evidence in [Brookshire Brothers'] possession or control will be material and relevant to that claim." 106 S.W.3d 718, 722 (Tex. 2003) (emphases added).

4

Arguing that the additional footage would have been helpful to the key issue of whether the substance was on the floor long enough for the employees of Brookshire Brothers to reasonably have discovered it, Aldridge moved for a spoliation instruction at trial.[4] The trial court allowed evidence of the spoliation to be admitted at trial and submitted an instruction to the jury. This instruction was one of the milder spoliation instructions, allowing, but not requiring, the jury to presume harm if the jury found Brookshire Brothers had spoliated evidence.[5] The jury returned a verdict in favor of Aldridge and awarded damages to compensate Aldridge for medical expenses and lost earning capacity.[6] The court of appeals affirmed.

## II. A Significant Departure from "Broad Discretion"

Today, the Court eliminates a core component of our spoliation jurisprudence: the trial court's broad discretion in constructing an effective remedy. In *Trevino v. Ortega*, we specifically noted "there is no one remedy that is appropriate for every incidence of spoliation; the trial court must respond appropriately based upon the particular facts of each individual case." 969 S.W.2d

---

[4] Additionally, Aldridge's attorney argued, and Gilmer agreed, that "the video [Brookshire Brothers] had before it was erased would have shown someone standing at that area, getting some help, and cleaning up [the] chicken grease." Though it is undisputed the view of the floor itself was obscured by a table in the video, surveillance footage of the clean-up process could have provided evidence of the size of the spill by revealing, for example, the number of employees and the amount of time it took to clean up the spill.

[5] Specifically, the trial court instructed the jury:

If you find that Brookshire Brothers knew or reasonably should have known that such portions of the store video not preserved contained relevant evidence to the issues in this case, and its non-preservation has not been satisfactorily explained, then you are instructed that you may consider such evidence would have been unfavorable to Brookshire Brothers.

[6] Notably, the jury awarded damages solely to compensate Aldridge for past and future medical expenses and past and future loss of earning capacity. It did not award Aldridge damages for physical pain and suffering, mental anguish, or physical impairment—so-called "soft" damages—casting doubt on the Court's presumption that the jury was unfairly prejudiced or inflamed by the presentation of the spoliation issue.

950, 953 (Tex. 1998). And in *Wal-Mart Stores, Inc. v. Johnson*, we likewise explained "[a] trial judge should have discretion to fashion an appropriate remedy to restore the parties to a rough approximation of their positions if all evidence were available." 106 S.W.3d 718, 721 (Tex. 2003). Before today's decision, trial courts *did* possess the discretion to effectively craft spoliation remedies befitting of the particular facts and circumstances of each individual case.

Trial courts have had the ability to address the spoliation of evidence in a variety of circumstances precisely because the spoliation remedies at a trial court's disposal vary in severity. For instance, the court might allow recovery of the fees and expenses resulting from the spoliation, exclude evidence adduced from spoliated evidence, or hold a party in contempt. *See* TEX. R. CIV. P. 215.2; *Trevino*, 969 S.W.2d at 959 (Baker, J., concurring). In particularly egregious cases of spoliation, the court may even strike pleadings or dismiss claims or defenses. *Trevino*, 969 S.W.2d at 959. And, before today, a trial court also had the option of allowing discussion of spoliation at trial, *Lively v. Blackwell*, 51 S.W.3d 637, 641 (Tex. App.—Tyler 2001, pet. denied), or submitting any one of the following varieties of jury instructions:

(1) The jury *may* presume evidence is harmful *if* it finds intentional spoliation, *Ordonez v. M.W. McCurdy & Co.*, 984 S.W.2d 264, 273 (Tex. App.—Houston [1st Dist.] 1998, no pet.);

(2) The jury *must* presume evidence is harmful *if* it finds intentional spoliation, *Wal-Mart Stores*, 106 S.W.3d at 721;

(3) That intentional spoliation has occurred, and the jury *may* presume the evidence is harmful, *id*.; or

(4) That intentional spoliation has occurred, and the jury *must* presume the evidence is harmful, *Trevino*, 969 S.W.2d at 952.

Though the Court purports to "enunciate with greater clarity . . . the parameters of a trial court's discretion to impose a remedy upon a finding of spoliation," __ S.W.3d at __, in effect the Court imposes new and significant restrictions on the trial court's discretion to submit a spoliation instruction to the jury. In essence, after today, trial courts may submit one, and *only one* spoliation instruction to the jury: an instruction that the trial court has found intentional spoliation has occurred, and therefore the jury *must* presume the evidence is harmful. All "milder" instructions, which permit the jury to exercise its judgment regarding the potential harm of the lost evidence to the spoliator's case, would require the jury to weigh the evidence of spoliation. This becomes an impossible task after the Court has concluded that, because of "the tendency of such evidence to skew the focus of the trial from the merits," such evidence of spoliation is inadmissible at trial. __ S.W.3d at __.[7] At bottom, the trial court's discretion is eliminated: it may only issue one instruction (requiring the jury to presume harm) and only in rare circumstances (when the court has found (1) the spoliating party acted with specific intent to conceal discoverable evidence *and* no lesser remedy will suffice to overcome the prejudice the spoliation caused, or (2) a party negligently failed to preserve evidence *and* the nonspoliating party has been irreparably deprived of any meaningful opportunity to present a claim or defense).

---

[7] The Court hedges its conclusion regarding the admissibility of evidence, explaining that "we recognize that all references to missing evidence, whether lost due to a party's spoliation or missing for some other reason, cannot and should not be foreclosed." __ S.W.3d at __. But the Court's holding still deprives the trial court of the discretion to submit questions regarding spoliation issues to the jury and curtails the ability of the trial court to utilize the Rules of Evidence to ensure juries are not exposed to unduly prejudicial evidence.

This narrowing of the trial court's discretion stems from the Court's conclusion that spoliation instructions inappropriately shift the focus of the trial from the merits of the case to the spoliation. Though the Court assumes the admission of evidence regarding spoliation will wrongly shift the focus of litigation away from the merits of a case, it provides no evidence that this has been a significant problem in Texas, and certainly no evidence that the problem is so widespread as to require the displacement of decades of Texas spoliation jurisprudence affording trial courts broad discretion.[8] And although there is some risk that spoliation issues could shift the focus of litigation away from the merits of the case, the Court fails to indicate how restricting the trial court's discretion would mitigate this risk.

On the contrary, Texas already has a framework providing guidance for trial courts in determining whether the jury may hear evidence of spoliation: the Texas Rules of Evidence. Despite the admittedly fact-specific nature of cases involving spoliation, the Court concludes that such issues are better resolved by a blanket rule that spoliation evidence is per se inadmissible at trial. But the Rules of Evidence exist so that the Court need not engage in developing specific rules of admissibility for each type of evidence a trial court might encounter, recognizing the value of affording trial courts flexibility in making context-specific evidentiary rulings. Under Rule 402, irrelevant evidence is inadmissible. TEX. R. EVID. 402. And under Rule 403, relevant evidence may nevertheless be excluded if its probative value is substantially outweighed by, *inter alia*, the danger

---

[8] As articulated above, our jurisprudence has allowed trial courts to craft spoliation instructions that permit the jury to make certain spoliation findings. *See Wal-Mart Stores*, 106 S.W.3d at 721 ("The instruction informed the jury that it must presume that the missing reindeer would have harmed Wal–Mart's case *if* the jury concluded that Wal–Mart disposed of the reindeer after it knew or should have known that they would be evidence in the case. Such an instruction is a common remedy for spoliation, with roots going back to the English common law." (emphasis added)).

8

of unfair prejudice, confusion of the issues, or misleading the jury. TEX. R. EVID. 403. There is no indication that our trial courts are unable to appropriately apply Rules 402 and 403 to determine the admissibility of spoliation evidence, and I would not so lightly displace it.

Despite the benefits of affording trial courts broad discretion and the absence of evidence indicating that Texas trial courts are regularly abusing that discretion, the Court concludes that it must depart from this well-established precedent and significantly limit such discretion. Now, trial courts are stripped of their discretion to decide which spoliation instruction is appropriate and no longer have the option of allowing the jury to resolve factual disputes concerning spoliation.[9]

---

[9] The Court maintains that its framework is in accordance with the majority of federal courts of appeals, but the majority of federal circuits also afford district courts discretion as to whether evidence of spoliation is admitted at trial and allow for a permissive (rather than mandatory) jury instruction. *See, e.g.*, *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013) ("Whether an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault."); *Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 422 (9th Cir. 2011) ("[T]he District Court's sanction, which permits the jury to decide if any documents were destroyed . . . strikes us as precisely the kind of flexible and resourceful sanction order that district judges should be encouraged to craft."); *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1219–20 (10th Cir. 2008) (explaining that "[a]n adverse inference is a powerful sanction as it . . . 'necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of an erased audiotape'" (citing *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900–01 (8th Cir. 2004))); *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746–48 (8th Cir. 2004) (finding no abuse of discretion in the district court's instruction to the jury that "[y]ou may, but are not required to, assume that the contents of the voice tape and track inspection records would have been adverse, or detrimental, to the defendant"); *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000) ("A district court has discretion to admit evidence of spoliation and to instruct the jury on adverse inferences."); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996) ("The defendant also chastises the court for admitting evidence of another missing record . . . . Once again, the ruling cannot be faulted. The defendant had no good explanation for the missing log, and the jury was entitled to infer that the defendant destroyed it in bad faith."); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 157 (4th Cir. 1995) ("We conclude that the district court acted within its discretion in permitting the jury to draw an adverse inference if it found that Vodusek . . . caused destruction or loss of relevant evidence."); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994) ("The admissibility of spoliation evidence and the propriety of the spoliation inference is well established in most jurisdictions."); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010), abrogated on other grounds by *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135 (2d Cir. 2012) ("The least harsh instruction *permits* (but does not require) a jury to *presume* that the lost evidence is both relevant and favorable to the innocent party.").

Because I do not believe the Court has laid the foundation to support this substantial departure from settled spoliation jurisprudence, I cannot join its opinion.

### III. Willful Blindness

In addition to depriving trial courts of the substantial discretion they once exercised in remedying spoliation, the Court's framework—more specifically, the *manner* in which the Court's framework is applied—in effect permits a party to escape liability for the destruction of relevant evidence by simply demonstrating the destruction occurred in accordance with the party's existing document retention policy. On the contrary, "when a policy is at odds with a duty to maintain records, the policy [should] not excuse the obligation to preserve evidence." *See Trevino*, 969 S.W.2d at 957 (Baker, J., concurring).

Under the Court's framework, a trial court must first make a preliminary determination as to whether spoliation occurred as a matter of law. This involves finding whether (1) the spoliating party had a duty to preserve evidence, and (2) the party breached that duty by failing to preserve the evidence. If the trial court finds both duty and breach, it must then assess the proper remedy. The trial court may submit a spoliation instruction only in circumstances where the party intentionally spoliated evidence and no lesser remedy will suffice to remedy the prejudice caused to the nonspoliating party (or in the rare instance when as a result of negligent destruction of evidence a party is "irreparably deprived of any meaningful opportunity to present a claim or defense"). __ S.W.3d at __. With regard to "duty," the Court echoes the standard articulated in *Wal-Mart Stores*, namely that the duty to preserve evidence "arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession

10

or control will be material and relevant to that claim." 106 S.W.3d at 722. The Court then expressly recognizes that "the party seeking a remedy for spoliation must demonstrate that the other party breached its duty to preserve material and relevant evidence." __ S.W.3d at __.

Once the trial court determines that a party had the duty to preserve evidence and breached that duty by failing to do so, the Court's framework requires the trial court to assess an appropriate remedy. For an instruction to be proper, the trial court must find both intentional destruction[10] and prejudice to the nonspoliating party. The Court correctly notes that "intentional" encompasses the concept of "willful blindness" in which a party does not directly destroy evidence known to be discoverable, but nevertheless "allows for its destruction." __ S.W.3d at __. Thus, under the Court's definition of "intentional," a party that is aware of circumstances that are likely to give rise to future litigation but fails to take reasonable steps to ensure the relevant evidence is not destroyed pursuant to "routine practice" may be found to have intentionally destroyed evidence.

But the Court renders this notion of "willful blindness" ineffective, for it nevertheless concludes (assuming without deciding that Brookshire Brothers breached a duty to reasonably preserve evidence) "there is *no evidence*" that [Brookshire Brothers] failed to preserve the surveillance footage "with the requisite intent to conceal or destroy relevant evidence . . . ." __ S.W.3d at __ (emphasis added). Curiously, the Court reaches this result despite the fact that at the time Brookshire Brothers allowed the additional surveillance footage surrounding Aldridge's fall to automatically erase, Brookshire Brothers (particularly Gilmer) knew of Aldridge's fall, knew

---

[10] The Court's framework also allows for a spoliation instruction when evidence is merely negligently destroyed, but only under the exceptional circumstance that the spoliation irreparably deprives the nonspoliating party of any meaningful ability to present a claim or defense.

11

Aldridge had filed an incident report documenting the fall and requested a copy of the footage, and had already agreed to cover Aldridge's medical costs above and beyond the amounts Brookshire covered pursuant to its routine practice.[11] It was Gilmer's conscious and intentional choice not to review or retain any more than the eight minutes of surveillance footage capturing the fall, a choice he made despite his admitted awareness that a key issue in a slip and fall case is whether employees had actual or constructive notice that there was a substance on the floor. And this choice inevitably resulted in the destruction of relevant evidence approximately thirty days after the fall occurred. If the concept of "willful blindness" is to have any meaning, these circumstances must give rise to at least some evidence of "willful blindness," and therefore at least some evidence that Brookshire Brothers acted with the requisite intent. But as it stands, the Court's assurances that its spoliation framework encompasses instances of "willful blindness" ring hollow given the Court's application of the concept to the facts of this case.

As a result of new technology and the accompanying exponential increase in electronically-stored data, document retention policies are now the rule rather than the exception. *See, e.g.*, *Arthur Anderson LLP v. United States*, 544 U.S. 696, 704 (2005). After all, "[n]o company possibly can, or should, indefinitely retain all the documents that it receives or generates." MARGARET M. KOESEL & TRACEY L. TURNBULL, SPOLIATION OF EVIDENCE: SANCTIONS AND REMEDIES FOR DESTRUCTION OF EVIDENCE IN CIVIL LITIGATION 25 (2d ed. 2006). Retention policies have become a nearly-essential part of the corporate landscape. And limited-duration retention policies have become

---

[11] Again, Brookshire Brothers agreed to pay these additional medical costs in a letter dated September 29, 2004. Nevertheless, Brookshire Brothers maintained it was not aware of circumstances likely to give rise to future litigation.

commonplace. *See, e.g.*, *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 312 (Tex. 2012) (company's thirty-day document retention policy for email resulted in only one responsive email). These limited-duration retention policies are designed not only to minimize the cost of discovery but also to assure the destruction of potentially unfavorable evidence.[12]

The proliferation of electronically stored information and the resulting increasing reliance on retention policies make the concept of "willful blindness" all the more acute.[13] Now more than ever, courts must ensure that companies cannot "blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy." *See Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1112 (8th Cir. 1988). But the Court's application of its spoliation framework opens the door for corporations to do just that. A party may allow for the destruction of relevant evidence, despite notice of circumstances likely to give rise to future litigation, and come away unscathed—an "advantage" of document retention policies already recognized in the document management services industry.[14]

---

[12] For example, a prominent document management services provider notes that one reason to define a retention policy is "[t]o reduce the dangers of eDiscovery. Minimizing the amount of electronic material an organization keeps means it has less material to produce during eDiscovery—and consequently it is less likely to hand over incriminating evidence." Iron Mountain, *Setting Retention Policy for Electronic Information*, 2 (2011), http://imknowledgecenter.com/~/media/Files/Iron%20Mountain/Knowledge%20Center/Reference%20Library/White%20Paper/S/Setting%20Retention%20Policy%20for%20Electronic%20Information%20US.pdf.

[13] Indeed, as recent events have brought to light, even six-month retention policies can have devastating effects on the preservation of evidence. The Internal Revenue Service is currently under congressional investigation regarding potential discrimination in the way it processed applications for tax-exempt status. It has now revealed that it "has lost untold numbers" of emails relevant to the investigation as a result of computers crashing and, because pursuant to IRS policy, the backup tapes were recycled every six months. *See* ASSOCIATED PRESS*, Emails: IRS Official Sought Audit of GOP Senator*, THE WASHINGTON POST, June 25, 2014, *available at* http://www.washingtonpost.com/business/archivist-irs-didnt-follow-law-with-lost-emails/2014/06/24/d8e7f7be-fc01-11e3-b8bf-54b8afb537b6_story.html.

[14] *See supra* note 12.

13

Our spoliation framework should not allow a party to pre-select the evidence that will be available against it and escape liability for the destruction of unfavorable evidence under the guise of a retention policy that preserves information for a limited time. Unfortunately, today's holding potentially provides future litigants with a blueprint for successfully shielding themselves from spoliation liability: simply establish a document retention policy with a limited duration. Because I believe the Court's holding does not provide sufficient meaning to the concept of willful blindness given the trend toward increasing reliance on limited-duration document retention policies, I cannot join the Court in its new spoliation framework or its application to this case.

## IV. Rulemaking

The spoliation of evidence, as the Court notes, is both an evidentiary concept, as well as a particularized form of discovery abuse. Thus, spoliation issues are particularly well-suited to redress via the rulemaking process. Indeed, the Federal Rules Committees have recognized this, and as this Court acknowledges, are in the process of amending the Federal Rules to provide district courts with guidelines for addressing the spoliation of evidence. *See* __ S.W.3d at __ n.3. Rather than follow a similar path in Texas, the Court endeavors to create a spoliation framework outside of the rulemaking process under the rationale that "the challenges facing Texas courts are just as acute." __ S.W.3d at __. But the Court has done nothing beyond considering this isolated case to determine what spoliation challenges are facing Texas courts. In crafting a spoliation rule outside the rulemaking process, the Court severely restricts the input of the bench, academy, and bar on what the contours of the spoliation rule should be.

14

As several former justices have observed, "[r]ather than make such changes by judicial decree, the better practice is to enact these reforms in conjunction with our rulemaking procedure . . . . A statute or rule could provide the precision that is lacking in the Court's opinion." *In re Allied Chem. Corp.*, 227 S.W.3d 652, 666 (Tex. 2007) (Jefferson, C.J., dissenting); *see also Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 216 (Tex. 2001) (Baker, J., concurring); *accord State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("[W]e do not revise our rules by opinion."). Our rulemaking process is meant for situations such as this. The Constitution requires our Court to "promulgate rules of civil procedure for all courts not inconsistent with the laws of the state as may be necessary for the efficient and uniform administration of justice in the various courts." TEX. CONST. art. V, § 31. To gather input, we appointed a Supreme Court Advisory Committee in 1940 to recommend rules of administration and procedure—which we continue to rely on to this day. Misc. Docket No. 11-9259 at 1, Supreme Court of Texas, Dec. 28, 2011. The committee—composed of fifty-two distinguished judges, professors, and attorneys—"solicits, summarizes, and reports to the Court the views of the bar and public." *Id.*[15]

The Court maintains that it need not concern itself with the rulemaking process because there is not a current rule in Texas addressing spoliation. But the absence of a rule does not mean we should de facto implement a rule without the thorough vetting the rulemaking framework affords. This is especially so because rules that impact how lawsuits are tried are best implemented with input from those that are actually trying cases—trial judges and litigators. As "the principal

---

[15] In contrast, this case has received a total of three amicus briefs, all supporting the petitioner.

15

mechanism for the regulation of proceedings in Texas courts,"[16] the rulemaking process can ultimately yield clarity and uniformity not otherwise attainable when this process is eschewed in favor of judicially-crafted rules.

## V.  Conclusion

As the Court itself acknowledges, trial courts have necessarily enjoyed broad discretion in remedying acts of discovery abuse, including evidence spoliation.  Rather than leave such discretion intact, the Court displaces the discretion trial courts have properly used and in its place establishes a formulaic process.  Further, though the Court in name embraces the concept of "willful blindness," the Court's application of its formulaic process to the facts of this case renders this concept essentially meaningless.  This is particularly troublesome given the increasingly common corporate use of limited-duration document retention policies.  Litigants and our system of justice deserve a spoliation framework that fosters the preservation of relevant evidence by equipping trial courts with the discretion to tailor remedies to the offenses committed.  Until today, such a framework existed in Texas.  Because the Court unnecessarily abolishes it, I respectfully dissent.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:** July 3, 2014

---

[16] William V. Dorsaneo, *The History of Texas Civil Procedure*, 65 BAYLOR L. REV. 713, 714 (2013).

16